IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:19-CV-97-FL

| | | |
|---|---|---|
| JENNY G. BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| TOWN OF TOPSAIL BEACH, TOWN OF | ) | |
| TOPSAIL BEACH POLICE | ) | |
| DEPARTMENT, and JACOB ALLEN in | ) | |
| his individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment (DE 39), and plaintiff's motion to strike and exclude expert testimony (DE 51). The motions have been briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendants' motion is granted, and plaintiff's motion is denied as moot.

## STATEMENT OF THE CASE

Plaintiff commenced this action in Superior Court of Sampson County, North Carolina, on March 8, 2019, asserting claims arising out of alleged excessive force during the course of her arrest by defendant Jacob Allen ("Allen"), police officer for defendant Town of Topsail Beach ("Town") and Town of Topsail Beach Police Department ("Police Department"). In the operative complaint, filed December 16, 2019, plaintiff seeks damages for violations of her Fourth, Eighth, and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983, as well as state law claims for

negligence, gross negligence, negligence per se, respondeat superior, assault, battery, and punitive damages.[1]

Following a period of discovery, on September 15, 2020, defendants filed the instant motion for summary judgment, relying upon a statement of material facts and the following exhibits: 1) declaration of defendant Allen; 2) excerpts of depositions of plaintiff, defendant Allen, and Samuel Louis Gervase ("Gervase"), the chief of police of the Police Department; 3) a declaration and an expert report by John E. Combs ("Combs"); and 4) video from a body camera on defendant Allen.[2] That same date, plaintiff filed the instant motion to strike and exclude expert testimony of Combs, relying upon defendants' initial expert witness disclosure and the expert report of Combs.

Plaintiff responded in opposition to defendants' motion on October 30, 2020, relying upon a statement of material facts and the following exhibits: 1) plaintiff's declaration; 2) excerpts of depositions of plaintiff, defendant Allen, and Gervase (and corrections and certification thereto); and 3) plaintiff's medical records. Defendants responded to plaintiff's motion that same date, relying upon correspondence between counsel and a final report of mediator. Defendants replied in support of their motion on November 14, 2020.

---

[1]     On March 31, 2020, on defendants' motion, the court dismissed plaintiff's claims under the North Carolina Constitution, but allowed remaining claims to proceed forward. See Beard v. Town of Topsail Beach, No. 7:19-CV-97-FL, 2020 WL 1539924, at *6 (E.D.N.C. Mar. 31, 2020).

[2]     On September 22, 2020, the court allowed defendants to manually file a paper copy of an affidavit of Allen attaching a "flash drive" containing video files as Exhibits A-K. (Order (DE 53) at 1). Defendants manually filed, on January 7, 2021, a USB drive containing video from a body camera on defendant Allen, as described in further detail herein. (See clerk's docket entry dated January 7, 2021). The court received a courtesy copy of the USB drive on January 22, 2021.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows.[3]   On March 28, 2016, at approximately 7:45 p.m., defendant Allen observed plaintiff operating a golf cart with no headlights driving south on Channel Boulevard in the Town.  (Def's Stmt. ¶ 1).  Plaintiff stopped the golf cart beside defendant Allen's vehicle and defendant Allen thereafter initiated field sobriety tests of plaintiff and arrested her for driving while intoxicated.  (Id. ¶ 2).  "The patrol vehicle [defendant] Allen was driving to transport [plaintiff] to the Pender County Jail did not have a 'cage' to separate [him] from the suspect in the back seat, so he seated [plaintiff] in the front seat, with her hands behind her back."  (Id. ¶ 4).  Plaintiff did not report to defendant Allen that she had any type of physical limitation or medical condition that would have precluded using handcuffs to secure her hands.  (Id. ¶ 6).

Interactions between defendant Allen, from the time he initiated her arrest, during her entire transport from the Town to the magistrate's office at the Pender County Jail in Burgaw, North Carolina, and during her processing at the magistrate's office, are recorded with clear video imagery from defendant Allen's body camera.  (See id. ¶ 7; see Def's Video Exs. A-G).[4]  Because of the importance of the videos to the analysis herein, the court recounts in detail below statements made by plaintiff and defendant Allen, and their visible movements, as pertinent herein.

---

[3]      Undisputed facts are drawn from those portions of defendants' statement of facts that are admitted or undisputed by plaintiff, as well as the videos described herein. Unless otherwise specified, any citations to numbers in exhibits designated by docket entry (DE) number are to page numbers as specified on the electronic version of the document filed on the docket, being the page number supplied by the court's electronic case filing system (CM/ECF), rather than the page number specified on the face of the document, in the event of any difference between the two.

[4]      Unless otherwise specified, citations to "video" refer to the body camera video exhibits contained on the USB drive filed manually on January 7, 2021. (See Allen Decl. ¶¶ 5-10, 14).  The court describes in further detail herein the contents of seven body camera videos included on the USB drive.  Although defendant Allen notes in his declaration that an additional "Car Video I-IV" was provided to plaintiff in discovery (id. ¶ 9), files so identified on the USB drive are not in a playable format.  Where the parties do not cite or rely upon any "Car Video" files in any briefs or statements of facts, the court does not address them further for purposes of the instant motion.

| Time | Description |
|---|---|
| 7:59 p.m.[5] (Video-1 00:23) | The first video begins with plaintiff sitting in her golf cart, stating, "Sir, sir, please just let me go home." It continues with process of defendant Allen taking portable breathalyzer tests and conducting field sobriety tests of plaintiff, including determination that plaintiff registered a "17" on a breathalyzer test. (14:29). |
| 8:18 p.m. (Video-1 19:10) | Defendant Allen directs plaintiff, stating "Alright, ma'am, could you step outside of the vehicle?" (referring to the golf cart). Plaintiff complies, and states, "Yes, sir." Plaintiff sees the handcuffs, and says "Oh my god!" and puts her hands over her face. Defendant Allen states, "Can you turn around, ma'am?" twice, to which she responds, "Yes, sir," and complies. Defendant Allen states, "Do you understand why I am placing you under arrest?" Plaintiff responds, "Yes, sir." Defendant Allen states, "Alright, thank you, ma'am, let me see your wrists, this one." (The video does not show the handcuffs, but they are heard adjusting. During the process of placing the handcuffs, plaintiff states, to her husband who is standing some distance away, "Bobby,[6] bring me some water, please." |
| 8:18 p.m. (Video-1 19:35) | Defendant Allen states, "Alright, let me see this one," referring to plaintiff's other wrist. After several seconds (at 19:39), defendant Allen states, "Don't turn it. It might hurt you. You ok?" Plaintiff responds, looking over her left shoulder, "Please, turn that one the other way." Defendant Allen responds: "Turn it the other way?" Plaintiff states, "Something ain't right." Defendant Allen responds, "Alright, I'll turn it the other way, ok?" Plaintiff again states, "Bobby," to her husband, who can be seen standing with the other officer. Plaintiff then states, "Turn it, just turn it." Defendant responds, "I'm going to turn it," twice. (19:49). Plaintiff states, "Bobby, bring me some water." |
| 8:19 p.m. (Video-2 19:52) | At this point, the video shows that plaintiff does not have the handcuffs on both of her writs. Rather, plaintiff's right arm is at her side. Defendant Allen then states, "Don't worry," while he is heard adjusting the handcuff away from |

---

[5]     The court provides in this column both the actual time and the elapsed time on the face of the video. The face of the video starts with 00:01 and continues through 21:56, approximately 22 minutes total (where, the number before the colon is minutes, and the number after the colon is seconds). There is no actual time stamp on the face of the video. However, the court estimates that actual time based upon the start time of the second and successive video, which is titled "Jacob Allen_20160328_08_21_Ptm Allen_10-72_1157862.ts," and five subsequent videos, which also are titled in a way that specifies the actual time. For example, the second video includes the date and time in its title as follows: "20160328**_08_21**." Subtracting 22 minutes from the start of the second video provides the basis for the court's estimate of the actual time, 7:59 p.m., at the start of the first video. Subsequent videos specify start time as follows: the third video, which is out of sequence, specifies: "20160328**_09_10**." The fourth video: "20160328**_08_46**"; the fifth video: "20160328**_09_34**"; the sixth video: "20160328**_10_22**"; the seventh video (again out of sequence): "20160328**_09_58**." The total elapsed time of all the body cam videos thus is over two hours thirty minutes.

[6]     Based on the context of the dialogue in the videos, "Bobby" refers to plaintiff's husband who is at the scene during parts of the first and second videos.

| Time | Description |
|------|-------------|
| | plaintiff. (20:01). Turning back to plaintiff, defendant Allen states, "You know what, all this is going to be uncomfortable," and, referring to something on plaintiff's wrist, he states "You want to give that to Bobby?" Plaintiff responds, "No, sir." (20:07). Defendant responds, "Ok." |
| 8:19 p.m. (Video-1 20:18) | While defendant Allen is readjusting the handcuffs, plaintiff states to her husband, "I'm a drug felon, Bobby." Defendant Allen states, "Can you turn your wrist for me, ok?" (20:22). Plaintiff moves her arms and states "I want them [unintelligible]." (20:27). Defendant Allen states, "Yeah, you can't do 'em that way, because that way, it's going to hurt you in the car, ok? Let's do 'em this way." (20:29). |
| 8:19 p.m. (Video-1 20:30) | At this point in the video, the clicking sound of the handcuffs is heard, and plaintiff turns her head and says, "Don't do 'em tight." (20:35). Defendant Allen responds "That's...." Plaintiff interjects, "I'm not going to go anywhere." (20:37). Plaintiff turns her head, again, sounding irritated, stating "God." (20:39). Defendant Allen responds, "That's not, that's not that tight, ma'am, I can still get three fingers in there, ok, so, ok?" (20:43). |
| 8:20 p.m. (Video-1 20:46) | Defendant Allen starts to state, "Let me," at which point, plaintiff again states over to her husband, "Bobby, can you bring me some water?" (20:47). Defendant Allen finishes with the handcuffs (20:56). The other officer approaches and states to defendant Allen, "can she have some water?" (20:58). Defendant Allen responds, "Yes sir," and then to plaintiff, "You can have some water, that's fine with me." (21:01). The other officer assists plaintiff with drinking from a water bottle. |
| 8:20 p.m. (Video-1 21:15) | Defendant Allen states to the other officer, "Can you watch her for a second, I am just going to clear my front seat." Plaintiff states, "I'm not going anywhere." Defendant Allen responds, "I understand, ma'am." The video shows defendant Allen clearing his front seat then returning over to plaintiff. |
| 8:20 p.m. (Video-1 21:48) | Plaintiff's husband approaches the officers and asks them to let her go. Defendant Allen responds, "No sir, it's past that, she's under arrest, she's going to go to Burgaw." Defendant's husband states, approaching, "You're kidding me." Defendant Allen states, "No, I'm not kidding you, and you better back up, sir, I'm serious, don't." (End of first video). |
| 8:21 p.m. (Video-2 00:01) | The second body camera video starts with officers in discussion with plaintiff's husband. Defendant Allen then escorts plaintiff to the front of the patrol car. She states to defendant Allen, "I get to ride in the front." Defendant Allen responds, "Yes, ma'am, it's nice and comfy in the front." (00:25). "Alright, now, watch your head, don't hit your head as you get in . . . swing your leg back in." As plaintiff brings her legs into the car, she states "My arms." (00:42). Defendant Allen states, "I understand. If you have to move |

| Time | Description |
|---|---|
| | forward." (00:45). Plaintiff states, "Those are too tight." Defendant Allen responds: "No, no ma'am, it's not too tight. That's how it's got to be, ok?" After a pause, during which plaintiff does not respond, defendant Allen states: "Now, if you would, scoot back, and I'm going to bump out the seatbelt. Is that ok?" (00:54). Plaintiff does not respond. Defendant Allen states, "Alright. Thank you, ma'am." Defendant Allen then closes the door to the patrol car, with plaintiff inside. (01:01). He reopens the door several seconds later to adjust something on the dash, and plaintiff coughs lightly before defendant Allen closes the door a second time. (01:12). |
| 8:22 p.m. (Video-2 1:13) | Defendant Allen, outside the patrol car, returns to speak with the other officer and plaintiff's husband at the golf cart, which discussion escalates to the point that plaintiff's husband states "You better be <u>damn</u> nice to her," and defendant Allen responds, "Sir, if you don't quit, you'll go to jail, too." (02:15). At one point, plaintiff's husband returns to the golf cart to retrieve a dog, and states "I'm going to speak to her real quick," proceeding towards the passenger side of the patrol car. (2:36). Defendant Allen states "No, you're not," gesturing for him to leave the area. As defendant Allen is telling plaintiff's husband to leave, he speaks to plaintiff through the closed door, "I'll be over to get you. Stay calm." (03:01). Plaintiff's husband leaves the area after a further exchange with officers, at which point defendant Allen can be heard stating "He came this close to going. That close." (03:30). Officers discuss removal of the golf cart. |
| 8:25 p.m. (Video-2 04:24) | Defendant Allen briefly opens the door to the patrol car. Plaintiff can be seen in the passenger seat sitting upright. After a couple seconds, defendant Allen opens the door again and asks plaintiff "Are you cold?" (04:27). Plaintiff responds, "No, I think it feels wonderful. Thank you, sir." (04:29). Defendant Allen responds, "You're welcome," and again closes the car door. (04:30). Defendant Allen returns to the golf cart, where a neighbor comes to drive away the golf cart. (05:22). Defendant Allen walks back to the patrol car, and enters the driver's side door. (06:04). |
| 8:27 p.m. (Video-2 06:10) | As the patrol car begins the trip to Burgaw, plaintiff states, "Excuse me, I was getting upset about the neighbors coming around. It's kind of embarrassing. Sorry, I'm sorry." Plaintiff's face is visible in the camera, while the interior light of the car is still illuminated. Defendant Allen responds, "You're fine," as he's turning out the light. |
| 8:27 p.m. (Video-2 06:17) | Over the next few minutes, plaintiff asks defendant Allen a series of questions, and makes a number of statements, including: "What's your name?" "Are you married?" (07:13) "So, no kids, right? Just wondering." (07:18) "Where are you from, sir?" (08:28) "Pender County? You like being a cop in Topsail?" (08:36) "It's kind of peaceful, isn't it. I love it. It's a nice place to work, it's beautiful, isn't it? (08:52). "You're crossing the yellow line" (09:42). |

| Time | Description |
|---|---|
| | "Where'd you go to high school?" (10:09) "Oh, my gosh, I had the best brunswick stew made, I was so excited about getting ready to eat it, I had put my bread in the oven." (10:50). "You really have to watch your speed between these two that switch over." (11:15). "How old are you?" (11:45) "You know what, I have a precious little girl. I mean she is absolutely beautiful." (11:55). |
| 8:34 p.m. (Video-2 13:17) | After defendant takes a dispatch call, plaintiff asks "What do you mean, very, very, compliant?" Defendant Allen answers, "It means you're in a very good mood, and you're doing very well. You're not resisting me in any way." (13:25). Plaintiff continues with a prior reference, noting "I was going to tell you, there's a very beautiful girl, really she's from New Jersey, she lives next door to me. She's the most precious person, she's beautiful." (13:48). Defendant Allen responds, "I'm engaged." (13:50). |
| 8:35 p.m. (Video-2 14:37) | After defendant Allen appears to drink from something, plaintiff asks "That's not beer, is it?" Defendant Allen responds, "no," and plaintiff states, "I'm just picking!" She then states, "Is there any law about you giving me some water?" (14:45). Defendant Allen responds, "if I had one in the car, I'd give you one, but I don't have one, any, in the car." Plaintiff continues, stating, "I'm so thirsty." (14:47). |
| 8:36 p.m. (Video-2 15:58) | Plaintiff states, "You don't have two car lengths between your two cars." Plaintiff coughs and says "excuse me." (16:39) |
| 8:38 p.m. (Video-2 17:03) | Plaintiff states, "You know, if you take your hands and put them really low, down next to your buttocks and lean back, it feels better." Defendant Allen, responds, "Yes, ma'am." |
| 8:38 p.m. (Video-2 17:28) | Plaintiff asks, "Have the golf cart laws, I mean what are the golf cart laws, and do you have to have tags?" |
| 8:40 p.m. (Video-2 19:11) | Plaintiff states, "I wish I had my lipstick. My lips are really dry. Do you have any chapstick?" Defendant Allen responds, "I do not ma'am." Plaintiff replies, "I'm sorry." |
| 8:41 p.m. (Video-2 20:38) | Plaintiff asks, "Have you ever eaten there before? . . . Oh, my gosh, you need to." Defendant Allen responds that he lives in Wilmington, and plaintiff replies "I understand that. They got good restaurants in Wilmington, for sure. My daughter lives in Wilmington. Actually, she came to see me today." Plaintiff continues describing restaurants, stating "Camina Riel [sic] is one of the best." (21:05). Immediately thereafter, plaintiff moves in her seat, and states, "I'm sorry, I'm trying to adjust this thing. My arm. They feel so tight." |

| Time | Description |
|---|---|
| | (21:10). Defendant Allen responds, "I put them as loose as I can without your hand slipping out." (21:15). Plaintiff states, "I would never slip out of them, sir, never." Defendant Allen responds, "I understand." Plaintiff then states, "They are, really tight. Something's wrong with this one up here. Maybe I got turn right [unintelligible]" (21:24). Approximately two seconds later, plaintiff continues describing restaurants, stating, "But, no, Camina Riel [sic] is better than any one in Wilmington, it's better than any Mexican place in Clinton," continuing further description of the restaurant (to 22:02). |
| 8:43 p.m. (Video-2 22:43) | Plaintiff states, "If you turn right here to the right, right around this curve, we have a building down there," continuing with describing a building for Town activities (to 23:27). |
| 8:44 p.m. (Video-2 23:28) | Plaintiff states, "Oh, my gosh, I've moved so many times," continuing with describing moves between different cities and accumulation of things (to 24:08). |
| 8:45 p.m. (Video-2 24:16) | Plaintiff states, "I sure wish I could brush the hair out of my face." (24:25 video-2 ends). |
| 8:48 p.m. (Video-4 01:51).[7] | Plaintiff describes to defendant Allen frequency of people using dialysis (to 02:36). |
| 8:49 p.m. (Video-4 02:56) | After defendant Allen remarks about something on the road, plaintiff states: "You're supposed to be patient. Patience is a virtue, you know. It is. I'm in no hurry to get there, are you? You're just, you're working. I'm just. There's no hurry." (03:15). |
| 8:52 p.m. (Video-4 05:08) | Plaintiff states, "I was Miss Clinton, I was Miss Wilson, my mother was Miss North Carolina," with additional description. |
| 8:53 p.m. (Video-4 05:58) | Plaintiff states, "I never had a set of handcuffs on. Not even in the bedroom. You know. Never. It's crazy." Defendant Allen laughs softly. Plaintiff continues, stating, "Doesn't feel really good. No, sir." Defendant Allen interjects, stating, "They're not made for comfort." Plaintiff continues, stating, "No, sir. They're not comfortable. I keep moving and I'm sorry." Defendant Allen responds, "You're fine." (06:28). |
| 8:54 p.m. | Plaintiff states, "Did you ever find out who's dog that was out there?" Defendant Allen responds, "Did not." Plaintiff continues, stating "Do you |

---

[7] As noted previously, Video-4 precedes in chronological order the material in Video-3.

| Time | Description |
|---|---|
| (Video-4 06:54) | know, I think it could have been Mr. Bobby's dog next door. . . ." Plaintiff continues describing her neighbors and their dogs, and preferences regarding dogs. Plaintiff remarks on the traffic (to 08:07). |
| 8:56 p.m. (Video-4 08:50) | Plaintiff and defendant Allen discuss driving practices. |
| 8:57 p.m. (Video-4 10:05) | Plaintiff asks defendant Allen, "Have you ever eaten at that little drive through Hibachi place? It is delicious isn't it." Defendant Allen responds that he has. Plaintiff continues by describing visits to the restaurant (to 10:38). |
| 8:58 p.m. (Video-4 10:50) | As the car is turning, plaintiff states, "We still have a long way, don't we son?" Defendant Allen responds, "Yes, Ma'am at least 30 minutes." Plaintiff states, "I know, my arms." (10:56). |
| 8:59 p.m. (Video-4 11:23) | Plaintiff remarks on smelling burning wood or leaves. |
| 9:01 p.m. (Video-4 13:08) | Plaintiff remarks on a trailer that has no license plate. Defendant Allen responds that is "not [his] area." (13:18). |
| 9:03 p.m. (Video-4 15:15) | Plaintiff remarks about a restaurant seen from the road, as well as other restaurants and various "delicious" foods (to 16:38). |
| 9:05 p.m. (Video-4 17:40) | Plaintiff remarks about a person who wants to learn how to drive a boat. |
| 9:07 p.m. (Video-4 19:20) | Plaintiff describes a law enforcement center located "somewhere in the woods over here" near the road where they are driving. Plaintiff continues describing a gun range at that location. Plaintiff also describes a gun range in Clinton, and various related topics including shooting skeet (to 21:25). |
| 9:09 p.m. (Video-4 21:45) | Defendant Allen's phone rings, and Defendant Allen states "Hey, Chief. Good. Good. No, no, no. . . ." At one point, he states "Oh, yeah, she's fine. Heck, he was worse than she was. . . . He was quite angry looking at me." He continues, stating, "I'm not at Burgaw yet, I'm coming through Rocky Point now." (23:27). He says "Thanks, Chief, Bye." (24:05). (End of Video-4). |
| 9:10 p.m. (Video-3 0:01) | Plaintiff asks defendant, "Do we have much longer?" Defendant Allen responds, "No, ma'am, less than 20 minutes." (00:26). Defendant describes |

| Time | Description |
|---|---|
| | their location in more detail. Plaintiff then states, "It's really, really, hard to have your hand behind your back like this." "I understand, but if I could have put them in front I would have." "Why?" "It's our policy, I've got to keep them in the back." "Sir, I understand, I do, I respect you, I do indeed, yes sir. Yes, sir, I do. Damn if they don't hurt." (01:05). "Not made for comfort." Plaintiff responds, "no." (01:11). After a few seconds, where defendant Allen remarked about a driver on the road, plaintiff states, "No, You were too fast up on his a**" Plaintiff and defendant Allen continue talking about this incident, with plaintiff at one point laughing out loud. (01:44). "It ain't long now. We're on the road that's going to take us there." Plaintiff responds "Thank you." Plaintiff states, "I mean, how much longer do I have to wear these things on my hands? (02:04). Defendant Allen responds, including "when we get to the magistrate, I'm going to have to leave them on for a little bit, ok?" Plaintiff responds "Ok." |
| 9:13 p.m. (Video-3 03:05) | Plaintiff asks, "What time is it, sir?" Defendant Allen responds, "It is 9:14." Plaintiff responds, "Ok. Thank you." |
| 9:14 p.m. (Video-3 04:17) | Plaintiff states, "This is a long ride for y'all. All the time. Do you have to do this a lot?" Defendant responds "Not too many times. I do it more than most." Plaintiff responds "I'm just kidding. Just golf cart . . . Just old golf cart women." Plaintiff and defendant Allen laugh out loud. (04:32) Plaintiff states, "No, I'm just kidding, son. I'm just kidding." "I should have never responded to that woman, when she said 'do you know who's dog this is?'" (04:45) "I'm always trying to help, though." "I understand ma'am. First off you shouldn't have been driving the golf cart." "You know what, we've lived down here for years and years and years. Bobby's been down here 23 years." (05:07) "And we've always had. . . I'm not knocking you, sir, don't get this wrong . . . we are responsible local people that really look after our law enforcement." (05:24). Plaintiff continues with discussion of how locals have helped officers in the past, stating "I'm not trying to be ugly, by no means," and "I've enjoyed taking a ride with you though." (06:26). |
| 9:17 p.m. (Video-3 07:20) | "Not long now, not even a couple miles and we'll be there." "Thank you, thank you so much. Thank you. My forehead is itching." (07:28). Plaintiff states, "I sure am thirsty." (07:52). Defendant Allen responds "I understand. When we get there, I'll let you drink some water. I believe they have a water fountain if I'm not mistaken." Plaintiff responds, "Thank you so much." (08:08). |
| 9:19 p.m. (Video-3 09:50) | Plaintiff states, "I'd rather have you tape my fingers. I've never had my hands behind my back like this. Because, but, hmm, it's painful." Defendant Allen responds, "Yes, ma'am." (10:02). Plaintiff states "Easter Sunday sure was |

| Time | Description |
|---|---|
| | rainy wasn't it?" (10:30) "I have never in my life. There was no sunrise at the sunrise service." (10:38). |
| 9:21 p.m. (Video-3 11:39) | While turning into the parking lot of the magistrate's office, plaintiff states "am I going to Jail?" "Yes, ma'am." Defendant Allen exits the vehicle and speaks with a woman at the magistrate's office, including noting that plaintiff registered a "17" on a portable breathalyzer test ("PBT"). (15:35). Defendant Allen returns to the vehicle after about seven minutes. (19:08). |
| 9:29 p.m. (Video-3 19:09) | Upon door opening, plaintiff states "You scared me. Can I get out?" Defendant Allen states, "Watch your head. Don't hit your head." Plaintiff states, "Alright." Plaintiff proceeds into the room, and states, "Am I going to be in here with a bunch of people?" Defendant responds, "No, ma'am, it's just you." Plaintiff replies, "Ok." (19:28). Plaintiff and defendant Allen then enter the breathalyzer room. Defendant Allen directs plaintiff to have a seat. Plaintiff states, "my bra strap is falling off." (19:38). Defendant Allen secures the vehicle, then returns to the room, gathers paperwork. Plaintiff remarks that she does not have "a driver's license or nothing." Defendant Allen responds "that is okay" and that he will look it up. Plaintiff can be seen on the video sitting in a chair next to a desk where defendant Allen is working. (21:58). Plaintiff tells defendant her birth date, and defendant Allen reads a statement of rights to plaintiff (22:20). "Sir, I know that you're all right and I'm going to sign anything. I was driving a golf cart. Here we go. I'm treated just like these people out there hurting people. I'm sorry." (24:08 End of video-3). |
| 9:34 p.m. (Video-5 00:01)[8] | Defendant Allen states, "I'm going to let you out of these handcuffs." (00:36) Plaintiff states, "Thank you so much. Thank you so much." Defendant Allen takes off plaintiff's right hand cuff, and plaintiff states, "Oh my gosh thank you." (00:49). Defendant Allen takes off plaintiff's left hand cuff, and plaintiff states, "Thank you sir." Defendant Allen responds, "You're welcome." (00:53). |
| 9:36 p.m. (Video-5 01:40) to 10:43 p.m. (video-6) | After plaintiff's handcuffs are removed, plaintiff signs a document with her right hand. (01:40). After some additional discussion, plaintiff states "Thank you for taking those cuffs off for me." (03:53). Activities continue in the magistrate's office, as depicted in over one hour of additional video footage, with no reference to handcuffs, including after the arrival of two friends for plaintiff (08:36) to end of video-5 (9:38 to 9:57 p.m.), through video-7 (from 9:58 to 10:21 p.m.), and video-6 (from 10:22 to 10:43 p.m.). |

---

[8] As noted previously, Video-5 follows Video-3 chronologically.

The day following her release from the magistrate's office, plaintiff sought medical attention from Dr. Seaborn Blair ("Blair"), who diagnosed plaintiff as "having [an] injury to the radial nerve of [her] right wrist" and "he noted swelling on [her] right wrist." (Pl's Decl. ¶ 6; see Pl's Ex. 2 (DE 66-2) at 1).

"Subsequent to her arrest, [plaintiff] was tried in District Court and convicted of the offense of Driving While Impaired." (Def's Stmt. ¶ 9). Plaintiff "continue[s] to suffer from a permanent injury to [her] wrist due to nerve damage." (Pl's Decl. ¶ 8; see Pl's Dep. 201, 213-214).[9]

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute

---

[9]    Where the parties have filed multiple deposition excerpts supporting and opposing summary judgment, page numbers in citations to depositions are those appearing on the face of the deposition transcript and not the page number affixed by the court's electronic case filing system (CM/ECF).

is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient

evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's]

favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary

judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached

exhibits, and depositions] must be viewed in the light most favorable to the party opposing the

motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable

probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the

necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace

v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law

is warranted where "the verdict in favor of the non-moving party would necessarily be based on

speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir.

2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable

inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at

489-90.

B.      Analysis

        1.      Section 1983 Claim for Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in

the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989).[10] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396.

"The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). "[P]roper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

"It is . . . well established that the right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest." Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002). Accordingly, "a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified . . . in effecting the underlying arrest." Id.; see Atwater v. City of Lago Vista, 532 U.S. 318, 354–355 (2001) (finding no Fourth Amendment violation where plaintiff was "handcuffed, placed in a squad car, and taken to the local police station" for a minor offense seatbelt violation). For example, the United States Court of Appeals for the Fourth Circuit held in Carter v. Morris, 164 F.3d 215 (4th Cir. 1999), that allegations that "handcuffs were too tight and that an officer pushed [the plaintiff's] legs as she

---

[10]     Plaintiff asserts that defendants fail to address plaintiff's claims under the Eighth and Fourteenth Amendments. However, defendants assert in their initial memorandum that "'[a]ll claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard.' Graham v. Connor, 490 U.S. 386, 395 (1989)." (Def's Mem. (DE 50) at 1 n. 1). Plaintiff does not respond to this argument, or propose an alternative framework for evaluating plaintiff's excessive force claim under the Eighth and Fourteenth Amendments. Accordingly, the court construes plaintiff's claims as arising under the Fourth Amendment.

got into the police car" are "so insubstantial that [they] cannot as a matter of law support [a] claim" for excessive force.  Id. at 219 n.3.

Other circuit courts have held that placement of handcuffs may constitute excessive force under certain circumstances.  For example, in Morrison v. Bd. Of Trustees Of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009), the Sixth Circuit held that a plaintiff may proceed to trial on an excessive force claim based upon evidence "that: (1) . . . she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing."  In Kopec v. Tate, 361 F.3d 772, 774 (3d Cir. 2004), the Third Circuit held that plaintiff may proceed with an excessive force claim based upon evidence that the defendant officer ignored the plaintiff's complaints of "unbearable" pain due to tight handcuffs.  See also Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc) (recognizing that "[i]n some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight").

Here, defendant Allen asserts a defense of qualified immunity.  "Qualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  Saucier v. Katz, 533 U.S. 194, 206 (2001).

"Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test . . . : (1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known."  Ridpath v. Bd. of

Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (quotations omitted).  The court "may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015).

In this case, the court resolves defendant's motion on the basis of the second qualified immunity prong.  A constitutional right allegedly abridged is "clearly established" for qualified immunity purposes if

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted).  "[I]t is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established." Hill v. Crum, 727 F.3d 312, 322 (4th Cir. 2013).  "If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." Id.

Case law from this circuit and the Supreme Court did not provide notice, at the time of the alleged violation in 2016, that defendant Allen's conduct constituted excessive force in violation of the Fourth Amendment.  As an initial matter, it is undisputed that plaintiff failed field sobriety tests, including registering a .17 on a portable breathalyzer test. (See Video-1 at 14:29; Video-3 at 15:35).[11]  Accordingly, defendant Allen was justified in placing plaintiff under arrest, affixing handcuffs on her wrists, and transporting her to the police station for processing. See Atwater, 532 U.S. at 355.  A reasonable officer in defendant Allen's position thus would know that "a standard

---

[11]    Generally, under North Carolina law, a person commits the offense of impaired driving if driving with an alcohol concentration of 0.08 or more. See N.C. Gen. Stat. § 20-138.1(a)(2).  It is also undisputed that plaintiff was convicted of the offense of driving while impaired.  (Def's Stmt. ¶ 9).

procedure such as handcuffing would rarely constitute excessive force where the officers were justified, as here, in effecting the underlying arrest." <u>Brown</u>, 278 F.3d at 369.

In addition, defendant Allen responded to plaintiff's initial request to readjust the placement of the handcuffs, specifically after she stated "something ain't right." (Video-1 at 19:39-19:49). Plaintiff is heard on the video stating "Turn it, just turn it," and defendant Allen responds "I'm going to turn it," twice. (<u>Id.</u> at 19:49). Then, the video shows that defendant Allen adjusts the handcuffs and reapplies them on plaintiff's wrists. (<u>Id.</u> at 19:52-20:30). Defendant Allen also asks plaintiff if she wants to give something to her husband, referring to something on plaintiff's wrist, but plaintiff declines. (<u>Id.</u> at 20:07).[12]

Subsequent comments from plaintiff regarding the handcuffs were not of a nature to put defendant Allen on notice that his conduct was in violation of a clearly established right, particularly in light of the Fourth Circuit's holding in <u>Carter</u> that allegations that "handcuffs were too tight," in themselves, are "so insubstantial that [they] cannot as a matter of law support [a] claim" for excessive force. 164 F.3d at 219. It is pertinent to this analysis the context and manner in which plaintiff communicated to defendant Allen about her handcuffs. <u>See</u> <u>Graham</u> (holding that proper application of the test of reasonableness "requires careful attention to the facts and circumstances of each particular case").

In particular, upon defendant Allen's reapplication of the handcuffs, plaintiff states "Don't do 'em tight" and she turns her head, sounding irritated, stating "God." (Video-1 at 20:35-20:39). Defendant Allen responds, "That's not, that's not that tight, ma'am, <u>I can still get three fingers in</u>

---

[12]      Plaintiff asserts in her brief that "[t]he handcuffs were not loosened or repositioned from the point that they were put on the Plaintiff." (Pl's Br. (DE 63) at 6; see Pl's Stmt. of Facts (DE 64) ¶ 7; Pl's Decl. (DE 66-1) ¶ 4). However, this is not entirely accurate. "Where, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." <u>Iko v. Shreve</u>, 535 F.3d 225, 230 (4th Cir. 2008). Here, the video shows an initial placement, readjustment in response to plaintiff's comments, and repositioning of the handcuffs on plaintiff's wrists.

there, ok, so, ok?" (<u>Id.</u> at 20:43) (emphasis added).  Notably, plaintiff does not state anything more to defendant Allen about the handcuffs.  Instead, she calls over to her husband, "Bobby, can you bring me some water?"  (<u>Id.</u> at 20:47).  Another officer is present, who assists with getting water and assisting plaintiff in sipping water. (<u>Id.</u> at 21:01).  Thereafter, defendant Allen clears his patrol car seat and returns to the scene, where defendant's husband engages in a tense exchange with officers.  (<u>Id.</u> at 21:15 to 21:48).  At that point, especially in light of the presence of plaintiff's husband and heated conversations with him, a reasonable officer in defendant Allen's position would not have reason to believe he had applied excessive force with the handcuffs.

During the next minute, defendant Allen assists plaintiff with getting into the front of the patrol car.  Plaintiff states "I get to ride in the front" as she approaches the seat.  (Video-2 at 00:25). As plaintiff if bringing her legs into the car, she states "My arms."  (<u>Id.</u>  at 00:42).  Defendant Allen states: "I understand.  If you have to move forward."  (<u>Id.</u>  at 00:45).  Plaintiff states, "Those are too tight."  Defendant Allen responds, "No, no ma'am, it's not too tight.  That's how it's got to be, ok?"  After a pause, defendant Allen states, "Now, if you would, scoot back, and I'm going to bump out the seatbelt. Is that ok?"  (<u>Id.</u> at  00:54).  Plaintiff does not respond.  Defendant Allen states, "Alright.  Thank you, ma'am."  Defendant Allen then closes the door, reopens it a few seconds later, and closes it again, with plaintiff not making further comment.  (<u>Id.</u>  at 01:01 to 01:12).  At that point, defendant Allen had heard plaintiff's complaints that the handcuffs were too tight, and responded to her.  Three minutes later, after an additional tense exchange with plaintiff's husband outside of the patrol car, defendant Allen opens the door and inquires, "Are you cold?" to plaintiff, to which she responds, "No, <u>I think it feels wonderful. Thank you, sir</u>."  (<u>Id.</u> at 04:29) (emphasis added).

At that point, again based upon the specific circumstances, a reasonable officer in defendant Allen's position would not have reason to believe he had applied excessive force with the handcuffs. Although plaintiff was not resisting arrest or attempting to evade arrest, her husband had confronted officers and he had come over to talk with plaintiff through the patrol car window, contrary to directions of the officers. (See Video-2 01:13 to 03:30). Defendant Allen had also determined by that point that plaintiff was intoxicated. (Video-1 at 14:29). Therefore, it was reasonable for defendant Allen to follow a standard procedure of keeping handcuffs on plaintiff while she was seated in the front seat of the patrol car.

This assessment is reinforced by the nature of the close conversation between plaintiff and defendant Allen during the subsequent ride in the patrol car from the Town to the magistrate's office in Burgaw. During this drive, which spanned approximately 53 minutes (from 8:27 p.m. to 9:21 p.m.), plaintiff engaged in casual and extended conversation with defendant Allen about a variety of topics ranging from personal matters to what was seen on the road, and plaintiff referenced the handcuffs only occasionally.

For example, when defendant Allen began the drive, plaintiff did not reference the handcuffs. Rather, plaintiff stated she was embarrassed by the presence of her neighbors (Video-2 06:10). For seven minutes following, plaintiff asks defendant Allen a series of personal questions and makes personal observations. (Id. at 06:17 to 13:17). Defendant Allen speaks to the dispatch and, when plaintiff inquires about what he said, he explains, "It means you're in a very good mood, and you're doing very well." (Id. at 13:15). Plaintiff does not counter this, but rather continues a prior topic of conversation, referencing "a very beautiful girl." (Id. at 13:48). This further reinforces the perspective of a reasonable officer on the scene that there is not an ongoing violation of a clearly established right through application of excessive force.

19

As the drive continues, plaintiff and defendant Allen discuss various topics. (See, e.g., Video-2 at 20:38; 22:43 to 24:08; Video-4 01:51 to 02:36, 06:54, 08:50, 10:05, 11:23-19:20).  At several points, plaintiff expresses her satisfaction, laughs, or states that she is kidding defendant Allen.  (See, e.g., Video-2 at 14:37; Video-3 at 01:44, 04:17, 04:32; Video-3 at 06:26).  Plaintiff asks about the time left to go on several occasions, but plaintiff also states at 8:49 p.m., "I'm in no hurry to get there, are you?"  (Video-4 at 02:56).  In several other instances, plaintiff complains about things other than the handcuffs, such as her thirst, her chapped lips, or her hair or clothing. (See, e.g., Video-2 at 14:47, 19:11, 24:16; Video-3 at 19:38).  In one instance, plaintiff remarks about how a shift in position improves the way the handcuffs feel. (Video-2 at 17:03).

In five instances in which plaintiff complains about the handcuffs while riding, she does so briefly in the midst of other casual conversation.  For example, at 8:41 p.m., while discussing restaurants with defendant Allen, plaintiff moves in her seat and the following dialogue immediately ensues:

> Plaintiff:  "I'm sorry, I'm trying to adjust this thing.  My arm.  They feel so tight."
>
> Defendant Allen: "I put them as loose as I can without your hand slipping out."
>
> Plaintiff:  "I would never slip out of them, sir, never."
>
> Defendant Allen: "I understand."
>
> Plaintiff: "They are really tight.  Something's wrong with this one up here.  Maybe I got turn right [unintelligible]."

(Video-2 at 21:10 to 21:24).   Approximately two seconds later, however, plaintiff continues describing restaurants, stating, "But, no, Camina Riel [sic] is better than any one in Wilmington, it's better than any Mexican place in Clinton," and plaintiff proceeds for about thirty seconds with further detailed description of the restaurant and its food. (Id. 21:26  to 22:02).  A similar pattern takes place at 8:53 p.m., 8:58 p.m., 9:10 p.m., and 9:19 p.m., when plaintiff states the handcuffs

hurt and are not comfortable. (See Video-4 at 06:54, 10:56; Video-3 at 00:26 to 01:11, and 09:50). Five minutes before the end of the car trip, at 9:16 p.m., after a long discussion about golf cart policies, plaintiff states "I've enjoyed taking a ride with you though." (Video-3 at 06:26) (emphasis added). Thus, when considered in context, plaintiff's complaints about the handcuffs while riding in the patrol car do not put defendant Allen on notice of an unreasonable application of force.

Once in the magistrate's office, plaintiff does not complain about the handcuffs and she is visible in the video in a calm demeanor. (See Video-3 at 19:09). After one hour and fifteen minutes in handcuffs, at 9:34 p.m., while seated in the magistrate's office, without any prompting from plaintiff, defendant Allen removes the handcuffs, and plaintiff thanks defendant Allen repeatedly, but without further description or comment. (Video-5 at 00:36). Thereafter, plaintiff's hands are occasionally visible and plaintiff signs a document with her right hand without comment. (See, e.g., Video-5 at 01:40; Video-7 at 07:14). In this respect, plaintiff's demeanor at the magistrate's office, considered in context with her demeanor while in the car, further reinforces that defendant Allen's placement of handcuffs did not constitute a clearly established violation of a constitutional right, from the perspective of a reasonable officer.

In sum, in light of all the foregoing circumstances, no reasonable officer in defendant Allen's position would conclude that he was violating a clearly established right through application of excessive force. Where the body cam video in this case clearly portrays the demeanor and communications by plaintiff during the entire time that she was handcuffed, there is no genuine issue of material fact, and the qualified immunity defense applies as a matter of law.

Plaintiff raises several arguments in opposition to the instant motion that are unavailing. As an initial matter, plaintiff contends that defendant Allen did not properly assert the defense of

qualified immunity, because he did not state all the necessary elements of the defense in his answer. Rule 8, however, only requires that a party "state in short and plain terms its defenses to each claim asserted against it," and "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(b)(1)(A) and 8(c)(1). This differs from the pleading requirement under Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Here, defendant Allen meets the requirements of Rule 8 by asserting in his answer that he pleads the "doctrine[] of qualified immunity . . . in bar of all or any part of Plaintiff's action which would be applicable." (DE 32 at 15). In addition, he meets the requirements of Rule 8 by asserting that his conduct "was necessary or reasonably perceived to be necessary under the circumstances," and that his actions were not "clearly violative of Plaintiff's rights at the time they were allegedly committed." (Id. at 16-17). Accordingly, defendant Allen properly pleaded the defense of qualified immunity.

Plaintiff argues that this case is analogous to several cases decided in other circuits. This argument misses the mark for two reasons. First, cases decided in other circuits do not constitute clearly established law for purposes of the qualified immunity analysis. See Hill, 727 F.3d at 322. These cases are not sufficient to put defendant Allen on notice of a clearly established right, where the law in this circuit in 2016 was framed by the courts' analyses in Brown, 278 F.3d at 369, Carter, 164 F.3d at 219 n. 3, and Atwater, 532 U.S. at 354–355. Neither the Supreme Court of the United States or the Fourth Circuit had found at that time a constitutional violation solely on the basis of placement of handcuffs by an officer who had probable cause that an arrestee had committed a crime. Indeed, in 2018, the Fourth Circuit held found a constitutional excessive force violation where an officer "handcuffed a calm, compliant ten-year-old who was surrounded by multiple adults in a closed room for hitting another child three days earlier," but the court determined that

the officer was entitled to qualified immunity because "the parties do not point us to any controlling authority" sufficient to put the officer on notice of a violation of a clearly established constitutional right. <u>E.W. by & through T.W. v. Dolgos</u>, 884 F.3d 172, 186 (4th Cir. 2018).[13]

Second, the cases upon which plaintiff relies are notably distinguishable from the undisputed facts of the instant case. For example, in <u>Meredith v. Erath</u>, 342 F.3d 1057 (9th Cir. 2003), an officer investigating "income tax related crimes" grabbed the suspect "by the arms, thr[e]w her to the ground, and twist[ed] her arms while handcuffing her." <u>Id.</u> at 1061. In <u>Kopec v. Tate</u>, 361 F.3d 772 (3d Cir. 2004), the court held that affixing handcuffs was an excessive force violation where the arrestee told the officer that "the pain was unbearable and begged him to loosen the handcuffs," then the arrestee "began to faint from the pain caused by the handcuffs and then fell to the ground," and then the arrestee "was groaning due to excruciating pain," and the officer "loosen[ed] the handcuffs" only after ten minutes. <u>Id.</u> at 774. In <u>Hanig v. Lee</u>, 415 F.3d 822 (8th Cir. 2005), "[t]he evidence was clear (from the senior officer present at the scene) that [the defendant] improperly applied the handcuffs, causing [the plaintiff] significant pain and severe bruising." <u>Id.</u> at 824. In <u>Vondrak v. City of Las Cruces</u>, 535 F.3d 1198 (10th Cir. 2008), the plaintiff told officers six times "that the handcuffs were too tight and that his wrists were hurting

---

[13]    <u>Cf.</u> <u>Robles v. Prince George's Cty., Maryland</u>, 302 F.3d 262, 269 (4th Cir. 2002) (holding that arrest of a plaintiff "comported with Fourth Amendment safeguards" where "officers made clear the reason for his arrest, handcuffed him, and placed him in the back of a police cruiser"); <u>Turmon v. Jordan</u>, 405 F.3d 202, 208 (4th Cir. 2005) (holding that "it would have been clear to a reasonable officer that he could not point his gun at an individual's face, jerk him from his [hotel] room, and handcuff him when there was no reasonable suspicion that any crime had been committed); <u>Smith v. Ray</u>, 781 F.3d 95, 103 (4th Cir. 2015) (holding there was no basis for officer to "justify yanking [female arrestee] up by her hair once she was handcuffed and under his control").

and going numb," and that they "felt like they were bleeding . . . cutting into" the plaintiff's wrists, including several requests during 1.5 hours at a police station, after breathalyzer tests showed 0.00 blood alcohol readings.  Id. at 1202.

The foregoing cases are instructively distinguishable from the undisputed facts of the instant case, particularly where defendant Allen initially repositioned plaintiff's handcuffs, confirmed he could place three fingers in them, engaged in extensive conversation with plaintiff about various topics she initiated on the ride to Burgaw, and removed the handcuffs soon after plaintiff was inside the magistrate's office.

Plaintiff suggests that medical evidence documenting injury to her wrists demonstrates a violation of a constitutional right. The court accepts as undisputed for purposes of the instant motion that plaintiff suffered injury to her wrists as a result of the handcuffing.  (See Pl's Dep. 201, 213-214;[14] Pl's Ex. 2 (DE 66-2) at 1-2)  However, even under the case law from other circuits cited by plaintiff, the extent of injury is not a determinative factor in whether there has been a violation of a constitutional right. See, e.g., Morrison, 583 F.3d at 401; Kopec, 361 F.3d at 774.

Plaintiff also suggests that deposition testimony by defendant Allen demonstrates a violation of a constitutional right.  For example, plaintiff notes that defendant Allen "testified that there was almost no action the Plaintiff could have taken that would have caused him to reposition the handcuffs."  (Pl's Br. (DE 63) at 6).  Plaintiff also asserts that defendant Allen "was aware that handcuffs could cause injury to a person's hands," and was "aware of civil cases saying that an injury could have been sustained from handcuffs."  Id. at 8.  The qualified immunity analysis, however, does not turn on the subjective understanding of the defendant as to the facts or the law.

---

[14]     Where the parties have filed multiple deposition excerpts supporting and opposing summary judgment, page numbers in citations to depositions are those appearing on the face of the deposition transcript and not the page number affixed by the court's electronic case filing system (CM/ECF).

Rather, it turns on what a reasonable officer would do under the undisputed facts and circumstances presented. See Graham, 490 U.S. at 397; Hill, 727 F.3d at 322.

Plaintiff argues that defendant Allen "had multiple alternatives when he was dealing with" plaintiff, in that he "could have loosened her handcuffs or gotten approval from Chief Gervase [to place] Plaintiff's hands in front of her." (Pl's Br. (DE 63) at 10). Plaintiff, however, does not proffer evidence supporting these assertions. For example, plaintiff cites deposition testimony of Town police chief Gervase. But, Gervase testified that his "officers did not have discretion" to place handcuffs in front of an arrestee, unless they were "notified or aware of some kind of physical ailment that that the person had that would . . . have created more problems," that is "if the person had a medical condition." (Gervase Dep. 24-25). Here, it is undisputed that plaintiff "did not report she had a physical limitation or medical condition." (Pl's Stmt. of Facts (DE 64) ¶ 6).

With respect to loosening plaintiff's handcuffs, defendant Allen testified he could have loosened plaintiff's handcuffs "[i]f [he] felt there was a need to, but [he] believe[d] that the handcuffs were not overtightened." (Allen Dep. 177). Defendant Allen also testified that he placed a finger in the handcuffs to test for tightness, (Allen Dep. 58, 63, 64, 106, 164), and he believed the "handcuffs weren't overtight" and that plaintiff could slide out of them if they were looser. (Id. at 164, 174). At bottom, the availability of an alternative course of action, upon hypothetical facts not presented to an officer on the scene, does not create a genuine issue of fact as to whether defendant Allen violated a clearly established right. See Graham, 490 U.S. at 396 (stating that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

In sum, plaintiff's § 1983 claim against defendant Allen for excessive force fails on the basis of qualified immunity. Therefore, this claim must be dismissed as a matter of law.

2.     Section 1983 Claim for Municipal Liability

"[A] municipality is subject to Section 1983 liability only when its 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury.'" Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469–70 (4th Cir.2013) (quoting Monell v. Dept. of Social Services of the City of New York, 436 U.S. 658, 694 (1978)).

"An official policy often refers to 'formal rules or understandings that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.'" Semple v. City of Moundsville, 195 F.3d 708, 712–13 (4th Cir.1999) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986)). "While municipal policy is most easily found in municipal ordinances, 'it may also be found in formal or informal ad hoc 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy.'" Edwards v. City of Goldsboro, 178 F.3d 231, 244–45 (4th Cir.1999) (quoting Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir.1987)).

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985). By contrast, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." Id. at 824.

A violation under this standard is shown, in the context of a failure to train, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390 (1989). It will not suffice to prove only "that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." <u>Id.</u> at 191. Otherwise, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." <u>Id.</u> at 192.

Here, plaintiff contends that the Town and Police Department are liable because police cars did not have "cages" in the back seat at the time of plaintiff's arrest, and chief Gervase had a policy of requiring officers to put arrestees in the front seat with their hands behind their backs. (Pl's Br. (DE 63) at 17). This asserted basis for municipal liability fails as a matter of law for several reasons. First, plaintiff has not brought forth any evidence that the front seat policy and lack of cages caused other incidents of constitutional excessive force violations. Second, plaintiff has not brought forth evidence that the policy was itself unconstitutional. Third, plaintiff has not brought forth evidence of the requisite "deliberate indifference" and causal connection between the alleged policy and the constitutional deprivation.

For example, plaintiff relies upon testimony from chief Gervase that having cages in police cars and a belt for affixing handcuffs in front of arrestees, which equipment was acquired after the instant incident, is "a more comfortable transport and safer for . . . everyone involved, the officer and the . . . arrestee." (Gervase Dep. 21). He testified "[t]hat is the preferred method now." (<u>Id.</u> 129). But this testimony proves no more than that the incident here may have been avoided if defendant Allen "had had better or more training," or better equipment. <u>Canton</u>, 489 U.S. at 391. It does not show that "the need for more or different training" or equipment was "so obvious, and

the inadequacy so likely to result in the violation of constitutional rights" to chief Gervase at the time of the incident. Id. at 390. Merely stating that another method is a "preferred method" in this context does not show use of the previous method was constitutionally deficient.

In sum, plaintiff fails to demonstrate a genuine issue of material fact that plaintiff's injury was caused by a policy of the Town and Police Department. Therefore, summary judgment must be granted as to this claim.

3.      Common Law Claims – Defendant Allen

Plaintiff asserts common law claims for assault, battery, negligence, gross negligence, against defendant Allen. Defendant moves for summary judgment on these claims on the basis of public officer immunity.

Public officer immunity protects a defendant against individual liability so long as he "lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption." Smith v. State, 289 N.C. 303, 331 (1976). In other words, a public officer may not be sued in his individual capacity unless the challenged action was 1) outside the scope of his authority, 2) malicious, or 3) corrupt. Id.

Malice, for purposes of public officer immunity, may be demonstrated by conduct: (1) "when done needlessly, manifesting a reckless indifference to the rights of others," (2) "which a [person] of reasonable intelligence would know to be contrary to [their] duty," and (3) "which [is] intend[ed] to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313 (1984); see Russ v. Causey, 468 F. App'x 267, 274 (4th Cir. 2012).

Here, plaintiff fails to demonstrate a genuine issue of material fact that defendant Allen's conduct rose to the level of malice and corruption sufficient to circumvent public official

immunity. First, it is undisputed that defendant Allen was acting within the scope of his duties as a police officer, in arresting and handcuffing plaintiff upon determining that there was probable cause that she was driving while intoxicated. Second, there is no evidence that defendant Allen knew he was acting contrary to a known duty in handcuffing plaintiff behind her back and placing her in the front seat of the patrol car. Indeed, Gervase testified that this was in accordance with Police Department policy at the time. (See, e.g., Gervase Dep. 130). Third, for all the reasons supporting application of qualified immunity, plaintiff has not demonstrated that defendant Allen manifested a "reckless indifference to the rights" of plaintiff. Grad, 312 N.C. at 313. Where there is no basis for concluding that defendant Allen violated a clearly established right of plaintiff, there is also no basis for finding malice for purposes of public officer immunity.

Plaintiff argues that public officer immunity is overcome on the basis of Bartley v. City of High Point, 272 N.C. App. 224, 846 S.E.2d 750 (2020). However, Bartley is instructively distinguishable in several key respects. There, in arresting a motorist, the defendant officer "was driving an unmarked car and dressed in plainclothes." Id. at 752. He pulled the plaintiff over in a driveway of his private residence, and he "did not identify himself as a police officer or state the reason for his traffic stop." Id. Plaintiff was "unaware [the defendant officer] was a police officer" and refused to follow commands to get back in his car. Id. at 753. As plaintiff's "back was turned, [the defendant officer] 'body slammed' him against the trunk of his car, handcuffed him, and informed him that he was being detained." Id.

Notably, each of the foregoing distinguishing facts was a basis for the court's determination that public officer immunity did not apply. The court determined the defendant acted wantonly and outside his duty because the defendant officer approached plaintiff "from behind without warning and body slammed him against the trunk of his car." Id. at 755. Likewise, the court found

a genuine issue of fact as to malice and intent to injure on this basis.  Id. at 757. In addition, the court determined there was a genuine issue of fact as to probable cause to arrest for obstructing because plaintiff "testified he was unaware that the individual standing in his driveway and ordering him to get back into his car was a police officer."  Id. at 755-756.  In sum, Bartley is inapposite, and by its reasoning it further reinforces application of public officer immunity under the undisputed facts in this case.[15]

Plaintiff also invites the court to decline to exercise supplemental jurisdiction over her state law claims, and plaintiff requests leave to file a motion to remand if the federal claims are dismissed. "The district courts may decline to exercise supplemental jurisdiction over a claim" if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Here, the court in its discretion exercises jurisdiction over the state law claims for purposes of resolving this motion, where the issues raised by the state law claims substantially overlap with the issues presented by the federal claims.  Due to application of public official immunity, the state law claims do not raise a novel or complex issue of state law or

---

[15]      Similarly inapposite is Thompson v. Town of Dallas, 142 N.C. App. 651, 656 (2001) where the plaintiff alleged that the arresting officer "proceeded to threaten plaintiff with chemical mace and handcuff her behind her back," "was treating the Plaintiff in a rough and callous manner," all while being informed by the plaintiff's son that the plaintiff "suffered from severe heart problems . . . and could experience another heart attack if [the defendant officer] did not stop his abusive behavior." Id. (emphasis added).  Plaintiff indeed suffered a heart attack within hours of the arrest requiring hospitalization.  Id.

predominate over the federal claims. Accordingly, in the interests of justice, the court addresses plaintiff's state law claims together with the federal claims in the instant order, and further proceedings are not necessary to resolve the jurisdictional issue.

In sum, public officer immunity bars plaintiff's state tort claims against defendant Allen. Accordingly, these claims must be dismissed as a matter of law.

4.      Common Law Claims Against Town and Police Department

Plaintiff asserts claims against Town and Police Department for negligent hiring and supervision, and on a theory of respondeat superior.

To state a claim for negligent hiring or supervision, plaintiffs must allege

(1) the specific negligent act on which the action is founded . . . [;] (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; [ ] (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' . . . ; and (4) that the injury complained of resulted from the incompetency proved.

Medlin v. Bass, 327 N.C. 587, 590–91 (1990) (emphasis omitted).

Here plaintiff does not present evidence demonstrating inherent unfitness or specific acts of negligence, either when defendant Allen was hired or before the incident with plaintiff, that would have put defendants on notice of any incompetence of defendant Allen. Therefore, plaintiff's claim for negligent hiring or supervision fails as a matter of law. In addition, because there is no genuine issue of material fact as to claims against defendant Allen, then summary judgment also is warranted on plaintiff's claims of respondeat superior against the Town and Police Department. See Johnson v. Lamb, 273 N.C. 701, 707 (1968) ("If the employee has done no [wrongful] act or omission, there is no liability on the part of the employer.").

In sum, plaintiff's state law claims against defendant Town and Police Department fail as a matter of law.

5.    Plaintiff's Motion

Plaintiff moves to strike and exclude testimony of defendants' expert witness, Combs. Where neither defendants nor the court rely upon testimony of Combs for summary judgment purposes, plaintiff's motion is denied as moot.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 39) is GRANTED. Plaintiff's motion to strike and exclude expert testimony (DE 51) is DENIED AS MOOT. The clerk is DIRECTED to close this case.

SO ORDERED, this the 25th day of June, 2021.


LOUISE W. FLANAGAN
United States District Judge